**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-46 (RDM)** |
| **v.** | : | |
| | : | |
| **PATRICK MONTGOMERY,** | : | |
| **BRADY KNOWLTON, and** | : | |
| **GARY WILSON** | : | |
| | : | |
| **Defendants.** | : | |

**MOTION IN LIMINE TO PRECLUDE ENTRAPMENT RELATED DEFENSES AND**
**ARGUMENTS AND**
**EVIDENCE ABOUT ALLEGED LAW ENFORCEMENT INACTION**

The government respectfully requests that the Court issue an order precluding

Defendants Brady Knowlton, Patrick Montgomery, and Gary Wilson from presenting evidence

or argument for any of the following: (1) claims that they were entrapped, (2) arguing former

President Trump (or any other Executive Branch official) gave permission to the Defendants to

enter or attack the U.S. Capitol, which would raise the affirmative defenses entrapment by

estoppel or public authority, (3) claims that by allegedly failing to act, law enforcement made the

Defendants' entry into the United States Capitol building or grounds or their conduct therein

lawful; or (4) any assertion concerning alleged inaction by law enforcement unless the

Defendants specifically observed or were otherwise aware of such conduct.[1]

Motions *in limine* are "designed to narrow the evidentiary issues for trial and to eliminate

---

[1] The government is aware of, and produced in discovery, a misleading YouTube video dated
April 6, 2022 and titled "Video of Brady Knowlton Entering the Capitol on January 6th with
Police Permission." *See* https://www.youtube.com/watch?v=NNfVOmDJWgw&t=196s, last
accessed on May 1, 2023.   Based upon information and belief, defendant Knowlton contracted
with Juda Engelmayer, a "full service public relations and crisis communications firm based in
New York" to produce and upload the video.   *See* https://judaengelmayer.com. Last accessed,
August 11, 2022.   The video appears to disclose USCP CCTV video subject to, and possibly in
violation of, the protective order.

unnecessary trial interruptions." *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 10 (D.D.C. 2011) (*quoting Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1070 (3d Cir. 1990)). The government presents these issues to the Court in an effort to prepare this case for an efficient trial.    For each motion herein, the United States asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.    For the Court's awareness, the government also anticipates filing a trial memorandum in which it will discuss additional legal or evidentiary issues that may arise during trial, but on which the government would not be seeking a pretrial ruling.

As an initial matter, the government notes the unique circumstances surrounding the offenses charged, and their location.    As of March 6, 2023, more than 999 defendants have been arrested for their participation in the events of January 6, 2023.    *See* https://www.justice.gov/usao-dc/26-months-jan-6-attack-capitol.    Specific to the Upper West Terrace door where the Defendants made entry, the government is aware of more than 25 charged defendants, with at least twenty-four defendants who made entry through the UWT door having been found guilty.[2]    The government is unaware of any Upper West Terrace (UWT)

---

[2] *See United States v. Jason Gerding*, 1:21-cr-00131-PLF-1 (ECF No. 78), *United States v. Christina Gerding*, 1:21-cr-00131-PLF-2 (ECF No. 80), *United States v. Jordan Revlett*, 1:21-cr-00281-JEB-1 (ECF No. 46), *United States v. Sara Carpenter*, 21-305 (JEB) (ECF No. 99), *United States v. Luke Bender*, Case No. 21-508 (BAH) (ECF No. 93), *United States v. Landon Mitchell*, Case No. 21-508-2 (BAH) (ECF No. 95), *United States v. Josiah Colt*, 1:21-cr-00074-DLF-1 (ECF No. 22), *United States v. Nicole Prado*, 1:21-cr-00403-RC-1 (ECF No. 47), *United States v. Richard Michetti*, 1:21-cr-00232-CRC-1 (ECF No. 54), *United States v. Bruno Cua*, 1:21-cr-00107-RDM-1 (Minute Order 2/24/2023), *United States v. Johnny Harris,* 1:21-cr-00274-RDM-1 (ECF No. 50), *United States v. Mick Chan*, 1:21-cr-00668-TNM-1 (Minute Order 1/24/2023), *United States v. Louis Valentin*, 1:21-cr-00702-JEB-2 (ECF No. 43), *United States v. Julio Baquero*, 1:21-cr-00702-JEB-1 (ECF No. 41), *United States v. Jeremy Baouche*, 1:21-cr-00733-CRC-1 (ECF No. 33), *United States v. Eduardo Nicholas Alvear Gonzalez*, 1:21-cr-00115-CRC-1 (ECF No. 52), *United States v. Andrew Wrigley*, 1:21-cr-00042-ABJ-1 (ECF

door defendant who was not found guilty of an offense related to the January 6, 2021 Capitol

insurrection, or their entry into the Capitol.    Similar or related motions *in limine* have been filed

in other UWT door cases.[3]    Similar motions *in limine* have been filed in other January 6 cases

where entry was made through a different door as well.[4]    Of the other UWT door defendants,

Eduardo Nicholas Alvear Gonzalez entered a few seconds before the Defendants and Defendant

Nicole Prado entered a few seconds after the Defendants.    The government does not suggest

that collateral estoppel could apply in this situation because the other UWT door cases involved

separate defendants with separate facts, but the significant number of cases with nearly identical

factual and legal issues related to entry through the UWT door establishes a robust evidentiary,

and legal, record that the Court can and should consider.    *Cf. Laughlin v. United States*, 344

F.2d 187, 189 (D.C. Cir. 1965) (The collateral estoppel doctrine, which has its roots in the civil

law, prevents repetitious litigation of the same issue by the same parties).

## I.    Factual Background

The Defendants are charged via indictment with offenses related to crimes that occurred

at the United States Capitol on January 6, 2021.    Even a cursory review of the events of that

---

40), *United States v. Chance Uptmore*, 1:21-cr-00149-RCL-1 (ECF No. 74), and *United States v. Ryan Suleski*, Case No. 1:21-cr-376 (RDM) (ECF No. 50), *United States v. Jared Cantrell*, 1:22-cr-00121-TNM (Minute Entry April 4, 2023), *United States v. Quentin Cantrell*, 1:22-cr-00121-TNM (Minute Order April 4, 2023), *United States v. Eric Cantrell*, 1:22-cr-00121-TNM (ECF No. 84), *United States v. Stacy Hager*, 1:21-cr-00381-TSC-1 (Minute Entry April 4, 2023), and *United States v. Ronald Sandlin*, 1:21-cr-00088-DLF-1 (ECF No. 99).

[3] *See United States v. Johnny Harris*, 1:21-cr-00274-RDM-1 (ECF No. 35, Minute Order 12/21/2022), *United States v. Nordean*, Case No. 21-CR-175 (TJK) (ECF No. 494), *United States v. Cantrell*, Case No. 22-CR-121 (TNM)(ECF No. 55), *United States v. Bender and Mitchell*, Case No.: 1:21-CR-508 (BAH) (ECF Nos. 68 and 76), and *United States v. Carpenter*, No. 21-cr-305 (JEB) (ECF Nos. 56, 78).

[4] *See United States v. Williams*, No. 1:21-cr-377 (BAH) (ECF No. 37), *United States v. Sheppard*, No. 21-cr-203 (JDB)(ECF No. 60), *United States v. Alford*, No. 21-cr-263 (TSC).

day, and the circumstances surrounding entry into the United States Capitol demonstrates that no one who entered the building that day was ignorant of the egregious violation of law that was taking place.    Defendants Knowlton, Montgomery, and Wilson's specific conduct, location, and circumstances demonstrates their intent to corruptly obstruct an "Official Proceeding of Congress" as well as commit the other violations charged.    Knowlton, Montgomery, and Wilson are charged with obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. § 1512(c)(2), along with five misdemeanor charges.    Montgomery is also charged with assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1), civil disorder in violation of 18 U.S.C. § 231(a)(3), and two additional misdemeanor charges. Additionally, Knowlton and Wilson are charged with theft offenses for stealing Emergency hoods from the Senate Gallery.

Prior to entry, the Defendants had a violent confrontation with Metropolitan Police Department Officers at the Lower West Terrace lawn area, with defendant Montgomery kicking an MPD officer in a struggle over his baton.



Figure 1 - B*WC Video of Officer Hodges*

Defendant Montgomery assaulted MPD Officer Hodges, and afterward, defendant Knowlton

helped Montgomery and both continued to taunt the besieged officers.



Figure 2- *Knowlton and Montgomery taunting officer - BWC video MPD Officer ND*

In the mind of at leFast one rioter, the assaults on law-enforcement at the Lower West Plaza were

the start of the Capitol riots.    Convicted January 6 defendant Anthony Robert Williams

identified this incident as the beginning of the rioting at the Capitol.    *See* Sentencing

Memorandum, *United States v. Williams*, Case 1:21-cr-00377-BAH, ECF No. 120, pg. 14-15.

Referring to the confrontation shown below involving Knowlton and Montgomery, Williams

testified that his fellow rioters were then "in a shoving match with the Capitol police officers"

and at that point his fellow civilians were "rioting." *United States v. Williams*, Case 1:21-cr-

00377-BAH, Trial Tr. at 88, 6/29/22, afternoon session.

 

Figure 3 *Image Admitted at Trial*          Figure 4 - *Same scene from the front – BWC ND*

*See* Sentencing memorandum, *United States v. Williams*, Case 1:21-cr-00377-BAH, ECF No.

120, pg. 14, BWC video MPD Officer ND, 2:02:34 pm.

  Shortly after the assault on law-enforcement, Knowlton, Montgomery, and Wilson were

at the Lower West Terrace, an area of extreme violence against law-enforcement.



Figure 5 -*Cruz Go Pro – GH010089 – 3:01 elapsed time*

Despite the violent assault on law-enforcement, and the obvious efforts to repel the rioters, including deployment of less-than-lethal munitions including pepper balls, OC spray, and stun grenades, the Defendants did not leave.   A short distance from where they were standing, an MPD officer placed a Long Range Acoustic Device (LRAD), specifically designed for crowd control and pointed in the direction of the defendants, blaring a dispersal order.



Figure 6 - *Dispersal Order Recording – BWC Video of Officer WB*

7

The loudspeaker announces the message on a 30 second loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately. This order may subject you to arrest and may
> subject you to the use of a riot control agent or impact weapon.

The Defendants climbed up the scaffolding where they are captured on open-source video staring

down at the violence at the Lower West Terrace.



*https://www.youtube.com/watch?v=AK46ZJsqAKo*
Figure 7 - *Defendants on scaffolding at approximately 2:16 pm*



*https://www.youtube.com/watch?v=AK46ZJsqAKo*
*Figure 8 - Defendants watching violence at Lower West Terrace*

The Defendants then made their way up the stairs under the scaffolding and witnessed the wreckage of the barricades that, a short time before, prevented the rioters from entering the Upper West Terrace.



Figure 9 - *Colt GoPro Video*
*Showing destruction of Barricades at Upper West Terrace*

The Defendants then made their way up the bleachers at the Upper West Terrace, as captured in

9

defendant Eduardo Nicholas Alvear Gonzalez's documentary video.



https://ia804507.us.archive.org/7/items/RXGNGvjfsGY3aan8e/goodlionfilms_IMG_5476_1_.mpeg4 - Figure 10 - *Defendants climbing bleachers as MPD blocks UWT door*

As defendant Gonzalez approaches the stairs that the defendants ascended a few seconds earlier, he continues to film and it is apparent that the MPD Civil Disturbance Unit (CDU) officers are responding to and forming up in that area and blocking the UWT door and that the UWT door is locked and not open.



https://ia804507.us.archive.org/7/items/RXGNGvjfsGY3aan8e/goodlionfilms_IMG_547 6_1_.mpeg4 - *Figure 11 - MPD blocking UWT door – marked with Red Arrow*

Defendants Knowlton, Montgomery, and Wilson then moved a heavy cart holding scaffolding material for the inauguration, possibly to provide greater ingress into the Capitol and/or to block police attempts to retake the Upper West Terrace door.    After the rioters breached the door from the inside, someone in proximity to defendant Gonzales screams "we're going in" and Gonzalez captures the MPD officers who have retreated to other areas of the UWT.



https://ia804507.us.archive.org/7/items/RXGNGvjfsGY3aan8e/goodlionfilms_IMG_547 6_1_.mpeg4 - *Figure 12 - Officers retreated from UWT door*

Several videos show Defendants when they moved the heavy dolly of scaffolding framing.

11



*Figure 13 - From Colt Go Pro Video*



https://archive.org/download/RXGNGvjfsGY3aan8e/goodlionfilms_IMG_5476_1_.mpeg4 -
Figure 14 - Defendants pushing cart containing scaffolding to UWT door area

A short time later, the dolly cart pushed by the Defendants was abandoned and used as a

barricade to block police from retaking the Upper West Terrace door.    Seconds later, video

shows that the dolly cart the Defendants were pushing was used as the base for a barricade from

police.



https://d2hxwnssq7ss7g.cloudfront.net/24Ilw6LP58X7_cvt.mp4
*Figure 15 - Dolly cart used as base of barricade – 2:36 pm*

The UWT door through which the Defendants gained entry was breached at

approximately 2:33 pm by rioters forcing the door open from the inside.



Figure 16 - CCTV Video – Showing breach by rioters from inside UWT door

Approximately two and a half minutes later, at 2:35:30 pm, the Defendants entered through the door with a piercing alarm sounding and past a sign on the door that read, "Emergency Exit Only – Push Until Alarm Sounds (3 Seconds) Door Will Unlock in 15 Seconds."



Figure 17 - Colt GoPro391.MP4 – Showing Emergency Exit Only Sign Seconds before Defendants enter UWT door



*Figure 18 - CCTV Video showing Defendants entry Through UWT door at 2:35:30 pm*

14

Defendant Gonzalez captures Knowlton walking towards the UWT door as they both gain entry.



https://ia804507.us.archive.org/7/items/RXGNGvjfsGY3aan8e/goodlionfilms_IMG_5476_1_.mpeg4

*Figure 19 - Knowlton after abandoning dolly cart and seconds before entry through UWT door*

The video of their entry also captures the piercing alarm from the breached UWT door.   They

did not pass through security and there was no indication that this was a legitimate entry-way to

the U.S. Capitol.   In fact, the alarm was blaring and the door they entered through was clearly

marked "Emergency Exit Only." As Judge McFadden observed in rendering a verdict in a

different case in which the defendant entered at the same door around the same time,

"[i]ndisputably, there were no officers at the door or indicia that this was a public door. Indeed,

boxes lined the narrow hallway inside the door, suggesting this is a private area." Transcript of

verdict, *United States v. Mick Chan*, No. 21-00668 (TNM) pg. 6 (finding the defendant guilty of

entering or remaining in a restricted building or grounds and other offenses).   After making

entry, the Defendants walked down a hallway towards a set of interior doors that led to a

stairway to the Rotunda.



*Figure 20 - CCTV Video of Defendant entry from exterior UWT door to interior door at 2:35:36 pm*

As is evident from the CCTV video, there were no officers present in the hallway towards the second set of doors when the Defendants entered.   When the Defendants approached the second set of doors, the doors were closed and the Defendants opened the doors to gain further entry into the Capitol and the Rotunda.



16

*Figure 21 - CCTV Video of Defendants' approach to interior UWT door at 2:35:40 pm*

It is not until after the Defendants opened the second set of doors and enter that they come into visual contact with law-enforcement officers at approximately 2:35:42 pm.



*Figure 22 - CCTV Video of Defendants passing through interior UWT door*

Defendant Gonzalez' video captures the same moment as the CCTV video, but from another angle.



17

<u>https://ia804507.us.archive.org/7/items/RXGNGvjfsGY3aan8e/goodlionfilms_IMG_5476_1_.m
peg4</u> *Figure 23 - Defendants from inside view*

Both videos confirm that no officers were present inside the door or hallway when the

Defendants entered the Capitol, and they were not present until after the defendants breached the

second set of doors.    At 2:35:59 pm, five officers with the U.S. Capitol Police Department

(USCP) responded to the breached outer UWT door in an apparent attempt to secure this breach.



*Figure 24 - CCTV Video of Officers approaching exterior UWT door*

At 2:37 pm, an individual with a video camera talked to one of the of five USCP officers, who

told her no one is allowed inside the building, saying "No you can't come in.    Nobody can

come in."



https://www.youtube.com/watch?v=L5hksM_R59M – *Figure 25 - Laura Brickman filming officer at UWT door telling her she can't come into the Capitol*

Video footage also captures rioters threatening the officers who were guarding the UWT door.



*Figure 26 -* https://www.youtube.com/watch?v=270F8s5TEKY

Because of allegations by rioters that they were let in at the Upper West Terrace

Doorway, all five officers who were present at one time or another near the interior second set of

doors during this time period were interviewed as part of an investigation into their conduct.

Those interviews were produced to the defense in Global Discovery.    Officer 1 stated:

> On January 6, 2021, I was assigned to the Inaugural Task Force at GPO building.
> Upon hearing the protest situation at the Capitol become dire, I responded over to
> assist... Arrived at Upper West Terrace door. Protestors were entering and exciting
> door. Door was in fire alarm mode. Sgt. Millard called over radio and asked for a
> key to secure. No radio response. I looked for a lockdown button but nothing but a
> phone was nearby. The door is a push bar, opening outward, with no way to even
> stick an object in the handles to prevent opening. Attempted to hold a line at the
> door to prevent further entry. Protestors formed on the outside. Other protestors
> inside appeared at our rear to exit or remained at rear. Crow[d] size significantly
> outnumbered officers. Decision was made to fall back. I was under the impression
> that CDV was nearby inside. We did not have the resources to effect any arrests, as
> only a few officers, few pair of handcuffs between the officers, significantly more
> protestors, no way to safely get the protestors if arrested to a transport. An[y]
> attempt to go hands on with the protestors would have yielded injury to officers and
> no achievable objective. Crowd flow entered building. Additional protestors exited,
> which again allowed protesters outside to recognize the door was open. Additional
> protestors entered. Began to make another attempt at a police line. Was able to hold
> crowd temporarily. [Fellow Officer] tried to rationalize with the crowd to no avail.
> Rear of crowd began pushing, causing front of group to advance on the line.
> Another decision was made [to] fall back. With no safe and achievable objectives,
> the goal was to find a larger contingent of officers and push the crowd outside the
> building. Moved back to the OAP hallway and responded to the House Chamber
> for the call of "shots fired."

Officer 2 stated:

> We began to fall back to the area inside the Upper West Terrace door where there
> were no support elements. When the group arrived at the door, I began attempting
> to direct the crowd to the nearest exit which was the Upper West Terrace door. I
> believed the door to be in alarm and to have been breached. Several people exited
> out of the door from the group where then I observed people from the crowd outside
> begin to enter the door. I along with [the other officers] made an initial effort to
> repel the group of people that were entering the door. A physical confrontation
> occurred where we began pushing and hitting the leading edge of the crowd in an
> attempt to expel them from the building. There was an older lady in the front of the
> group carrying a protest sign that began to scream in pain as she was crushed

between us. The group stopped their physical effort to push into the building and this is where I made a second attempt to de-escalate the situation and attempted to convince the group to leave. At some point, I specifically told the group that the building was closed and that's why they were not allowed in. During this dialogue, the main individual in the group is using language to provoke me to respond with physical force.   . . . The group began chanting to let us in. Throughout the entire dialog with the group, I used techniques to attempt to calm the group, I told the group that what they were doing was wrong, that in their arguments of defending the constitution that they were disrespecting the [Capitol] building and disrespecting the process. At this point, an individual in the group asked if I was ready to die to protect these people, I immediately attempted to deflect the question and de-escalate, [when] the same individual asked for a second time if I was ready to die for this place at which point I responded that l swore an oath to protect this place and that's what I'm going [to] do. At this point [the senior officer] grabs me by the shoulder, and pulls me back away from the crowd where the people at the door then begin to enter the building. I believe at this point I voiced a request over the USCP radio to have the key brought to the door to re-secure it.   . . . I was prepared to fight, I recognized that we were outnumbered by an adversary that was provoking a violent confrontation. I resolved that had a second confrontation to expel this group occurred, that the end result would have been lethal force. When [the senior officer] pulled me back, it caused me to break the cycle of thought of preparing to fight where I then transitioned in my mind to do what was necessary to preserve life. This included a strategic fall back and regroup to a position where we had better numbers and were in a better position to engage another effort to remove these people from the Capitol.

As a result of the internal investigation, it was determined that the officers at this doorway did not permit rioters into the building nor did they behave inappropriately.    In short, no officers invited the defendants into the U.S. Capitol on January 6, 2021.[5]

Defendants then made their way to the stairway by the East Rotunda door where they witnessed violence against law-enforcement as rioters forced the door open from the inside.

---

[5] Many defendants who entered the Capitol through the UWT door near the time the defendants made entry have specifically acknowledged that they "knew at the time [they] entered the U.S. Capitol Building that that [they] did not have permission to enter the building.   *See United States v. Nicole Prado*, No. 21-CR-403 (RC), ECF No. 33, *United States v. Jordan Revlett*, No. 21-cr-281, ECF No. 34, *United States v. Josiah Colt*, No. 21-cr-74, ECF No. 22, *United States v. Andrew Rigley*, No. 21-cr-42 (ABJ), ECF No. 29, *United States v. Ryan Suleski*, No. 21-CR-376 (RDM), ECF No. 40, *United States v. Chance Uptmore*, No. 21-CR-149, ECF No. 49.



*Figure 27 - Sandlin Video showing Defendant Wilson a few feet from officers being attacked at East Rotunda door*



Figure 28 - Ronald Sandlin Video showing USCP Officers trying to prevent further breach of the East Rotunda door

Within earshot of the Defendants, Sandlin was screaming "get out of the way, get out of the way.

. your life is not worth it today."

The Defendants then made their way to the Senate Gallery.    As they approached the Senate Gallery door, USCP Officers tried to lock the doors and rioters yelled to prevent them from locking the doors.    Rioters assaulted a USCP officer as the Defendants watched from inches away.



*Figure 29 - Colt Go Pro Video – showing Defendants inches from assault on USCP officer*



*Figure 30 - Sandlin Video – showing Knowlton inches from assault on USCP officer*

The Defendants then slipped past the officer as the assault took place, and chanted "treason!" to the empty Senate chamber.



https://www.youtube.com/watch?v=rdjyM1Bod0Q –

Figure 31 - Video showing Knowlton and Wilson chanting treason in breached Senate Gallery

Before they left, Knowlton and Wilson stole government property, namely escape hoods for emergency use that had been placed under the seats in the Senate Gallery.



*Figure 32 - CCTV video showing Knowlton opening stolen escape hood*

24

The time period from when rioters breached the UWT door from the inside until it was secured by MPD officers was relatively short.    At approximately 2:32 pm, MPD Civil Disturbance Unit (CDU) officers fell back from the secured UWT door.



*Figure 33 - BWC Video of Officer MF*

The first rioter entered through the breached door at approximately 2:34:05 pm.    MPD CDU officers resecured the UWT door area at approximately 2:46 pm.



*Figure 34 - BWC Video of Officer ML – showing barricaded path*

In the intervening twelve minutes, as discussed previously, as a few dozen individuals entered the UWT door, members of the mob immediately in front of the door were throwing and stacking scaffolding and other building materials, an alarm at the doorway was blaring, a sign on the door read "Emergency Exit Only," the air was redolent with pepper spray, and the entryway was covered in packages for storage.

## II.   This Court Should Preclude the Defendant from Arguing Entrapment, and the related affirmative defenses of an Entrapment by Estoppel or a Public Authority Defense

The government moves *in limine* to prohibit the Defendants from making arguments or attempting to introduce non-relevant evidence that 1) they were entrapped, 2) that former President Trump (or any other Executive Branch official) gave permission for them to enter or attack the U.S. Capitol, which would raise the affirmative defenses of public authority or

26

entrapment by estoppel, or 3) that the Defendants were enticed or entrapped by law enforcement in entering or attacking the U.S. Capitol.

Insofar as the Defendants may seek to claim that they were entrapped by law enforcement officers at the U.S. Capitol into committing some or all of the crimes with which they are charged, they should also be precluded from raising this defense as a matter of law at trial. The government is aware of no evidence that could support such a defense. Therefore, absent a proffer as to how such a defense could arise at trial, the government seeks an order precluding the Defendants, through the introduction of evidence or counsel's questions or argument, from arguing or claiming that they were entrapped by law enforcement officers into committing the charged offenses.

"A valid entrapment defense has two related elements: government inducement of the crime and a lack of predisposition on the part of the defendant to engage in criminal conduct." *Matthews v. United States*, 485 U.S. 58, 63 (1988). A defendant arguing entrapment must show that "the criminal design originate[d]" with the law enforcement officers, "and [that] they implant[ed] in the mind of an innocent person the disposition to commit the alleged offense and induce[d] its commission in order that they may prosecute." *Sorrells v. United States*, 287 U.S. 435, 442 (1932). "At a minimum, this requires a showing that the government agent actually solicited or suggested the criminal conduct." *United States v. Solofa*, 745 F.3d 1226 (D.C. Cir. 2014) (internal citations omitted); *United States v. Robinson*, No. CR 16-98 (CKK), 2021 WL 2209403, at *11 (D.D.C. May 31, 2021) (laying out case law as quoted above).

The Government alleges that the Defendants passed police perimeters and barricades into a restricted security area and active construction site, entered into the U.S. Capitol Building,

27

participated in overrunning the police line at the Senate Gallery, screamed in the direction of the Senate Chambers, and then stole items, all in service of an attempt to obstruct or impede or influence the certification of the 2020 Electoral College vote. There is no evidence that any government agent or law enforcement officer induced the Defendants to commit any of these alleged crimes. And there is certainly no evidence that a law enforcement agent or officer "actually solicited or suggested the criminal conduct" to the Defendant. *Solofa*, 745 F.3d 1226. Absent any such evidence, a defendant may not present such an entrapment theory to the jury. E.g., *Robinson*, 2021 WL 2209403, at *11 (affirming denial of entrapment instruction when defendant "failed to point to any evidence" of entrapment).

In short, the conduct of the Defendants was plainly beyond any conduct that could be reasonably sanctioned, and they were not actively misled or entrapped into committing the alleged crimes. The defendants should be prohibited from making arguments or attempting to introduce non-relevant evidence—either through cross-examination or their own case-in-chief— that they had permission to commit any of the crimes charged or that they were entrapped by law enforcement into doing so.

### A.        Entrapment by Estoppel

Any assertion that the Defendants cannot be held criminally liable because their actions were authorized by former President Trump must be precluded because, as former Chief Judge Beryl Howell has recognized, "following orders, without more, can[not] transform an illegal act into a legal one" and "even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability." *United States v. Chrestman*, 525 F.

Supp. 3d 14, 32-33 (D.D.C. 2021).    Indeed, judges in this District have repeatedly rejected a defendant's attempt to rely on the entrapment-by-estoppel defense to counterbalance the strength of the government's case during a challenge to the defendant's pretrial detention. *See also United States v. Chansley*, 525 F. Supp. 3d 151, 168 (D.D.C. 2021) ("The Court need not dwell on defendant's invocation of the estoppel by-entrapment defense. The same argument was raised and rejected in another case involving a participant in the January 6th events, and the Court adopts the reasons for rejecting that argument set forth there by Chief Judge Beryl Howell."). This Court has also previously granted a motion *in limine* to bar an entrapment by estoppel claim concerning the UWT door.    *See United States v. Johnny Harris*, Case No. 21-cr-274 (RDM), ECF No. 35 and Minute Order, 12/21/2022.

Moreover, on at least two occasions, other judges of this District have precluded defendants from raising one or both defenses at trial. Judge Walton, applying the case law described below, precluded a January 6 defendant from invoking the entrapment-by-estoppel and public authority defenses at trial. *See United States v. Thompson*, No. 21-cr-161-RBW, Dkt. 69 at 3-4 (D.D.C. Mar. 25, 2022). Judge Kollar-Kotelly did the same with respect to the first of those defenses.    *United States v. Grider*, No. CR 21-022 (CKK), 2022 WL 3030974, at *2-4 (D.D.C. Aug. 1, 2022).[6]    As demonstrated by those cases, judges of this District have determined well in advance of trial that those defenses can and should be precluded. The question of whether a defendant may seek to introduce evidence in support of public authority and/or entrapment by estoppel defenses presents a threshold legal determination for the judge, and not the trier of fact, to adjudicate.    Where, as a here, the defendant cannot meet his threshold burden, the Court

---

[6] Defense counsel in the *Grider* case is current counsel for Mr. Knowlton.

should preclude defendant as a matter of law from making arguments or attempting to introduce non-relevant evidence in support of those affirmative defenses.

As a matter of law, neither defense could apply on these facts and so the Defendants cannot invoke either at trial. The entrapment-by-estoppel defense applies only if the defendant was "actively misled . . . about the state of the law defining the offense," and relied on that misleading advice. *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018).   No such advice was given to the Defendants on or before January 6, and the Defendants have not proffered any evidence to the contrary.   The public authority defense, meanwhile, applies only to a "defendant who knows the conduct he has been authorized to commit is illegal," but believes he is acting as an agent of a government official who possessed actual authority to order his conduct. *United States v. Alvarado*, 808 F.3d 474, 485 (11th Cir. 2015). The defense is

> narrowly defined . . . and a defendant will not be allowed to assert the defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites. First . . . a federal law enforcement officer must have actually authorized the defendant to commit the particular criminal act at issue, and the defendant must have reasonably relied on that authorization when engaging in that conduct. Second, the government official on whom the defendant purportedly relied must have actually had the authority to permit a cooperating individual to commit the criminal act in question.

*Id*. at 484.   Here, no executive official had actual authority to ask the Defendants to unlawfully enter the Capitol, to participate in overrunning the police line at the Senate Gallery, or to go through the building to the entrance of the Senate Floor near Minority Leader Schumer's office while it was being protected by Capitol Police, to yell "treason" to the Senate chamber, to steal items or to obstruct Congress's certification of the Electoral College vote.   Moreover, both defenses also require that the Defendants' reliance or belief be reasonable.   Even if the Defendants believed that former President Trump authorized them to engage in illegal conduct,

30

or that the statutes they are now charged with had been interpreted to permit his conduct, neither belief would be reasonable.

"In a variety of procedural contexts, the vast majority of cases have held, as a matter of law, that the defense was unavailable on the facts of the case." *United States v. Conley*, 859 F. Supp. 909, 926 (W.D. Pa. 1994). Courts have routinely rejected either jury instructions or requests to put on evidence by defendants whose proffered evidence fails, as a matter of law, to meet the defenses' requirements. *E.g.*, *United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir. 1994) (affirming denial of motion to appoint psychological expert to testify in support of entrapment by estoppel defense); *United States v. Weitzenhoff*, 35 F.3d 1275, 1290 (9th Cir. 1993) (upholding refusal to instruct jury on entrapment-by-estoppel defense); *United States v. Brebner*, 951 F.2d 1017, 1024-27 (9th Cir. 1991) (affirming exclusion of evidence purporting to raise the defense as immaterial as a matter of law); *United States v. Etheridge*, 932 F.2d 318, 320-21 (4th Cir. 1991) (order granting motion *in limine* precluding evidence upheld).

In *United States v. Thompson*, No. 21-cr-161-RBW, the defendant was charged with Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2) and (2) (Count One); Theft of Government Property under 18 U.S.C. § 641 (Count Two); Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1) (Count Three); Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2) (Count Four); Disorderly Conduct in a Capitol Building under 40 U.S.C. § 5104(e)(2)(D) (Count Five); and Parading, Demonstrating, or Picketing in a Capitol Building under 40 U.S.C. § 5104(e)(2)(G) (Count Six). In early January 2022, Thompson filed a pretrial motion seeking to have the U.S. Marshals Service serve subpoenas on former President Trump and others

(including Rudolph Giuliani and other members of the former President's "inner circle"). *Id.* Dkt. 44 at 2. Judge Walton denied that motion, *id*. Dkt. 51, and directed Thompson to explain why those witnesses had relevant testimony. Thompson's filing asserted, in relevant part, that he intended to rely upon their testimony in support of two affirmative defenses: public authority and entrapment by estoppel.   In response, the United States argued that the defendant should be precluded from asserting both defenses. Judge Walton agreed and issued an order finding that the "testimony of the putative witnesses . . . is inadmissible in support of either of the first two versions of the public authority defense as described by the defendant." *Id*. Dkt. 69 at 2.

At trial, the jury heard evidence of certain statements made by former President Trump and Rudolph Giuliani on January 6, 2021, but the Court cautioned the jury that such statements "had been admitted for a limited purpose" and instructed the jury that "[y]ou're not to consider that evidence for any other purposes. Neither former president Donald Trump nor Rudy Giuliani actually had the power to authorize or make legal the alleged crimes charged in this case." April 14, 2022 Transcript at 618-619. The Court did not instruct the jury on the public authority or entrapment-by-estoppel affirmative defenses.

Likewise, in *United States v. Grider*, No. CR 21-022 (CKK), the defendant was charged with Civil Disorder under 18 U.S.C. § 231(a)(3) (Count One); Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2) and (2) (Count Two); Destruction of Government Property under 18 U.S.C. § 1361 (Count Three); Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1) (Count Four); Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2) (Count Five); Engaging in Physical Violence in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(4)

(Count Six); Disorderly Conduct in a Capitol Building under 40 U.S.C. § 5104(e)(2)(D) (Count

Seven); Act of Physical Violence in the Capitol Grounds or Buildings under 40 U.S.C. §

5104(e)(2)(F); and Parading, Demonstrating, or Picketing in a Capitol Building under 40 U.S.C.

§ 5104(e)(2)(G) (Count Nine).   On June 22, 2022, Grider filed a "Notice of Intent to Raise

Public Authority Defense," *id.* Dkt. 102, and the following day, Judge Kollar-Kotelly issued a

Minute Order directing legal briefing on the issue.   On July 7, 2022, Grider filed his "Brief in

Support of Defendant's Notice of Intent to Raise Public Authority Defense." *Id*. Dkt. 108. In his

brief, Grider pointed to language from former President Trump's speech on January 6, 2021, as

the basis for his assertion of the affirmative defense. *Id*. at 3. The Government filed its

opposition on July 20, 2022, noting that the entrapment-by-estoppel defense applies only where a

defendant was "actively misled . . . about the state of the law defining the offense" and relied

upon that misleading advice, and asking that the Court preclude the defense in advance of trial.

Id. Dkt. 111 at 6 (citing and *quoting United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)).

Judge Kollar-Kotelly rejected Grider's proposed affirmative defense and issued a

Memorandum and Order explaining that "[b]ecause no such defense is available under

Defendant's proffered facts, the Court shall not read an entrapment-by-estoppel instruction to the

jury." *United States v. Grider*, 2022 WL 3030974, *1 (D.D.C. Aug. 1, 2022) (Kollar-Kotelly, J.).

In particular, Judge Kollar-Kotelly cited and quoted Chief Judge Howell's description of the

defense as requiring the defendant to meet four separate elements:

> To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an
> offense must prove (1) that a government agent actively misled him about the state
> of the law defining the offense; (2) that the government agent was responsible for
> interpreting, administering, or enforcing the law defining the offense; (3) that the
> defendant actually relied on the agent's misleading pronouncement in committing
> the offense; and (4) that the defendant's reliance was reasonable in light of the

identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (internal quotations and brackets omitted) (*quoting Cox*, 806 F.3d at 1191). In that case, the Chief Judge's analysis focused on the fourth element, namely, whether reliance upon former President Trump's statements was reasonable. *Id*. 31-33. In *Grider*, however, Judge Kollar-Kotelly focused on the first, rather than final prong, to reject the applicability of the affirmative defense, observing that "[r]egardless of whether Defendant can satisfy the fourth prong, reliance, he certainly cannot satisfy the first prong, that President Trump 'actively misled him about the state of the law.'" *Grider*, 2022 WL 3030974, *3.

Here, the Defendants cannot meet the requirements set out by Chief Judge Howell in *Chrestman*.    To start, the Defendants have not and cannot point to any government official who advised them that their conduct was legal or who provided any interpretation of the law that covered their alleged criminal conduct. Former President Trump's speech on January 6 could not serve this purpose. As but just two examples, former President Trump did not state that the U.S. Capitol grounds were no longer "restricted" under 18 U.S.C. § 1752(a), nor that efforts to corruptly obstruct the certification of the Electoral count would be permissible notwithstanding 18 U.S.C. § 1512(c)(2). He therefore did not "actively mis[lead]" defendants "about the state of the law defining the offense." *Cox*, 906 F.3d at 1191.    The Defendants have not identified anyone else who might have authority to do so who did so either.

Just as "no President may unilaterally abrogate criminal laws duly enacted by Congress as they apply to a subgroup of his most vehement supporters," no member of law enforcement could use his authority to allow individuals to enter the Capitol building during a violent riot, and

34

after "obvious police barricades, police lines, and police orders restricting entry at the Capitol" had already been put in place by the United States Capitol Police and the Secret Service. *Id*. at 32. Indeed, recently, a judge of this Court ruled in another January 6, 2021, case that "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building." Memorandum and Order, *United States v. Williams*, No. 21-cr-377-BAH, at *2 (D.D.C. June 8, 2022).

The government notes that the unambiguous, and uncontested, video footage demonstrates that no police officers were immediately outside the UWT door, immediately inside the UWT door, or in the hallway upon the defendants' entry into the Capitol building.    In short, the Defendants had already breached the Capitol building, past numerous indications that such an entry was unlawful, when they first walked past USCP officers on the interior side of the second set of doors.    Consequently, no officers could have let them into the Capitol, or signaled that it was ok to enter the Capitol.

Even if the Defendants could establish that a member of law enforcement told them that it was lawful to enter the Capitol building or allowed him to do so, the Defendants' reliance on any such statement would not be reasonable in light of the "obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Chrestman*, 525 F. Supp. 3d at 32. Moreover, the Defendants' actions belie any argument that they actually relied on any such statement by law enforcement when they made a decision to unlawfully enter the Capitol building through a door broken open with a piercing alarm sounding.

Other Courts have also considered January 6 defendants' claims that concern the entry

through the UWT door.    This Court considered the conduct of Bruno Cua, including his entry

through the UWT door in *United States v. Cua*, Criminal Action No. 21-107 (RDM).    Based

upon facts presented during a stipulated trial, this Court found:

> At some point, Cua "left his parents' side," and, around 2:30 p.m., "climbed up the
> scaffolding on the Northwest front of the Capitol building while holding a black
> asp [(Armament Systems and Procedures)] baton in his hand." *Id*. (SOF ¶¶ 11–12).
> He reached the Upper West Terrace via the scaffolding, ***and entered the Capitol***
> ***through the Upper West Terrace doors (which were affixed with signs stating***
> ***"EMERGENCY EXIT ONLY") at approximately 2:36 p.m. Id. (SOF ¶¶ 13–14).***
> ***After walking through the doors, Cua encountered five U.S. Capitol Police***
> ***officers, who had formed a police line a few feet inside and were stopping***
> ***unauthorized people, including Cua, from entering the building.*** *Id*. at 7 (SOF ¶
> 14). Members of the crowd began chanting, "Let us in!;"Cua yelled "'we have your
> backs' while holding his cell phone in his right hand and waving the baton in his
> left hand." *Id*. After "several seconds," the police moved back and the
> "unauthorized people," including Cua, moved into the Capitol. *Id*.

Memorandum Opinion and Order, *United States v. Cua*, Criminal Action No. 21-107 (RDM),

ECF No. 288, pg. 3 (emphasis added).    The stipulated facts further proved that, "[a] s the

defendant approached, the double doors were propped open and a loud alarm was sounding as

people were streaming into the Capitol through the doors." ECF No. 281, pg. 6.    This Court also

previously considered briefing on the issue of entry into the UWT door in *United States v.*

*Johnny Harris*, Case No. 21-cr-274 (RDM), ECF No. 35 wherein the government argued, as the

government argues here, that the defendant should be precluded from arguing law-enforcement

inaction or entrapment by estoppel.    The defendant agreed with the government, and did not

object to the motion.    ECF No. 40.    On December 21, 2022, this Court granted the

government's motion concerning the UWT door "as unopposed." *See* Minute Order, 12/21/2022.

Proud Boy Ethan Nordean also entered the Capitol through the UWT door.    On

October 14, 2022, the government filed a motion *in limine* similar to the instant motion.    *United*

*States v. Nordean*, Case No. 21-CR-175 (TJK), pg. 30-31.   The motion was unopposed, and

subsequently granted by the Court.   *See* transcript of hearing, Dec. 14, 2022, pg. 30.

      *United States v. Carpenter*, Criminal No. 21-cr-305 (JEB) is also instructive.   In that

case, the defendant entered the Capitol through the UWT door at 2:44:17 pm.   The government

filed a motion *in limine* similar to the instant motion. *Carpenter*, Criminal No. 21-cr-305 at ECF

No. 56.   The Court granted the government's motion to preclude any entrapment by estoppel

defense based upon then President Trump's statements.   *United States v. Carpenter*, Criminal

No. 21-cr-305, 2023 U.S. Dist. LEXIS 21774 *; 2023 WL 1860978 (D.D.C). The Court ruled

that the motion was premature as it related to any defense claim that any failure to act by law

enforcement to prevent protesters from entering the Capitol rendered the defendant's conduct

legal.   *Carpenter*, Criminal No. 21-cr-305, 2023 U.S. Dist. LEXIS 21774 *8; 2023 WL

1860978.   Subsequently, the defendant was tried and convicted of all charged offense, including

the offense of Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. §

1752(a)(1).

      **B.**     **This Court Should Preclude any Public Authority Claim or Defense**

      The Defendants should also be prohibited from making arguments or attempting to

introduce evidence that law enforcement gave them permission to enter the U.S. Capitol. The

government notes that none of these three defendants has given notice of a Public Authority

Defense pursuant to Federal Rule of Criminal Procedure 12.3(a).   The government requests that

the Court instruct the Defendants to assert any claim under Fed. R. Crim. P. 12.3(a) here or be

barred from making such claim at trial.   As reasoned in *Chrestman*, "Cox unambiguously

forecloses the availability of the defense in cases where a government actor's statements

constitute 'a waiver of law' beyond his or her lawful authority." *Chrestman*, 525 F. Supp. 3d at

32 (*quoting Cox v. Louisiana*, 379 U.S. 559, 569 (1965)).

"The public authority defense allows 'the defendant [to] seek[ ] exoneration based on the

fact that he reasonably relied" on the "actual authority of a government official to engage him in

a covert activity.'" *United States v. Fulcher*, 250 F.3d 244, 253-54 (4th Cir. 2001); Fed. R. Crim.

P. 12.3(a)(1). "The difference between the entrapment by estoppel defense and the public

authority defense is not great." *Burrows*, 36 F.3d at 882; *United States v. Baker*, 438 F.3d 749,

753 (7th Cir. 2006) ("The elements that comprise the two defenses are quite similar."). Any such

defense would fail for the same reasons identified above.

First, "[t]he validity of" the public-authority "defense depends upon whether the

government agent in fact had authority to empower the defendant to perform the acts in question.

If the agent had no such power, then the defendant may not rest on the 'public authority'

[defense]." *Burrows*, 36 F.3d at 881-82 (*quoting Baptista-Rodriguez*, 17 F.3d at 1368 n.18).[7]

The circuits that have considered the issue are unanimous on that point.    Neither the President

---

[7] In *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) (per curiam), the court reversed the convictions of two defendants who participated in the burglary of Daniel Ellsberg's psychiatrist's office. The defendants claimed they did so at the behest of E. Howard Hunt, a long-time CIA agent who worked under the supervision of John Ehrlichman in the White House. *North*, 910 F.2d at 879. The case featured fractured separate opinions from the three-judge panel. Judge Wilkey, half of the two-judge majority, wrote that a defendant's reasonable reliance on the "apparent authority" of a government official (there, Hunt) to authorize his conduct could make out a defense. *Id*. (*quoting Barker*, 546 F.2d at 949 (opinion of Wilkey, J.). But that portion of *Barker* was not the controlling rationale, and the panel majority in *North* subsequently rejected North's request for an instruction invoking his superiors' "apparent authorization of his action." *Id*. at 881. In any event, Judge Wilkey's application of reasonable reliance in *Barker*—where the defendants, each of whom had worked with the CIA, claimed that a government official (and previous CIA supervisor) authorized what they allegedly were told was a counter-espionage operation—has no analogue here.

nor any other Executive Branch official has the authority to empower citizens to enter restricted Capitol grounds, assault Capitol Police officers, or obstruct congressional proceedings. *E.g.*, *North*, 910 F.2d at 891 n.24.

Second, "a defendant makes out a defense of public authority only when he has shown that his reliance on governmental authority was reasonable as well as sincere." *Burrows*, 36 F.3d at 882; *Fulcher*, 250 F.3d at 254; *Sariles*, 645 F.3d at 318-19. Again, any reliance on an Executive Branch official's statements would here be objectively unreasonable for the reasons given above, and again, the Defendants should be precluded from raising this defense as a matter of law.

## III.   This Court Should Preclude the Defendants from Arguing that Alleged Inaction by Law Enforcement Officers Made Their Conduct on January 6, 2021, Legal

In addition to prohibiting any defense argument that law enforcement officers actively communicated to the Defendants that entering the Capitol building or grounds was lawful, the Court should also bar the Defendants from arguing that any failure to act by law enforcement rendered their conduct legal. The same reasoning that applied in *Chrestman* again applies here. That is, like the Chief Executive, a Metropolitan Police Officer or Capitol Police Officer cannot "unilaterally abrogate criminal laws duly enacted by Congress" through his or her purported inaction. *Chrestman*, 525 F. Supp. 3d at 33. An officer cannot shield an individual from liability for an illegal act by failing to enforce the law or ratify unlawful conduct by failing to prevent it. Indeed, another judge of this District expressly reached that conclusion recently. *United States v. Williams,* No. 21-cr-377-BAH, at *3 ("Settled caselaw makes clear that law officer inaction— whatever the reason for the inaction—cannot sanction unlawful conduct."). This Court should

39

apply the same principle in this case. Accordingly, the defendants should be prohibited from arguing that their conduct was lawful because law enforcement officers allegedly failed to prevent it or censure it when it occurred.

**IV.    This Court Should Preclude the Defendants from Arguing or Presenting Evidence of Alleged Inaction by Law Enforcement Officers Unless the Defendants Specifically Observed or Was Otherwise Aware of Such Conduct**

The government acknowledges that the conduct of law enforcement officers may be relevant to the Defendants' states of mind on January 6, 2021. However, unless a defendant shows that, at the relevant time, he specifically observed or was otherwise aware of some alleged inaction by law enforcement, such evidence is irrelevant to the defendant's intent. Federal Rule of Evidence 401 states that evidence is relevant if it "has any tendency to make a fact more or less probable … and the fact is of consequence in determining the action." Fed. R. Evid. 401. Here, if the defendant was not aware of law enforcement's alleged inaction at the time of his entry onto restricted grounds or into the Capitol building (or at the time he committed the other offenses charged in the Information), any alleged inaction would have no bearing on the defendant's state of mind and therefore would not meet the threshold for relevance.    Again, another judge of this district adopted the same reasoning in granting an analogous motion in *limine* last year. *See Williams*, No. 21-cr-377-BAH, at *3-4.    The Court should reach the same conclusion in this case and should exclude testimony and evidence of any alleged inaction by the police as irrelevant, except to the extent the Defendants show that they specifically observed or was aware of the alleged inaction by the police when he committed the offenses charged in the indictment.    Here, it is particularly significant that the Defendants entered the UWT door with the alarm blaring, and the Emergency Exit sign clearly visible, and no officers were present on

the immediate inside of the door.    That is where they breached the Capitol Building, and no

subsequent claimed contact or conversation can ratify their illegal entry.

## <u>CONCLUSION</u>

For the reasons set forth herein, the government respectfully requests that this Court

preclude improper argument or evidence related to (1) entrapment, (2) entrapment by estoppel,

(3) any Public Authority defense, (4) and claim that law enforcement's alleged inaction rendered

the defendant's actions lawful, and (5) any evidence or argument relating to alleged inaction by

law enforcement except to the extent that the defendants specifically observed or was otherwise

aware of such conduct at the relevant time.


Respectfully submitted,

Matthew M. Graves
United States Attorney
D.C. Bar No. 481052

By:

<u>            /s/ James D. Peterson            </u>
James D. Peterson
Special Assistant United States Attorney
Bar No. VA 35373
United States Department of Justice
1331 F Street N.W. 6th Floor
Washington, D.C. 20530
Desk: (202) 353-0796
Mobile: (202) 230-0693
James.d.peterson@usdoj.gov


<u>            /s/     Kelly E. Moran            </u>
Kelly E. Moran
Assistant United States Attorney

41

United States Attorney's Office
601 D Street NW
Washington, DC 20503
202-740-4690
Email: kelly.moran@usdoj.gov


_____ */s/ Karen E. Rochlin* _____
Karen E. Rochlin
DOJ-USAO
99 Northeast 4th Street
Miami, FL 33132
305-961-9234
Email: karen.rochlin@usdoj.gov