## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-46-1 (RDM)** |
| **PATRICK MONTGOMERY,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Patrick Montgomery to 41 months of incarceration, the high end of the Guidelines range, 36 months of supervised release, $2,000 in restitution, a fine of $400, and a mandatory assessment of $100, on his conviction of assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1).

### I.    INTRODUCTION

The defendant, Patrick Montgomery, and his co-defendants, Brady Knowlton and Gary Wilson,[1] participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[2]

---

[1] Knowlton is scheduled for sentencing on November 14, 2024. This Court sentenced Wilson on July 2, 2024.

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

1

Montgomery intentionally disrupted the certification of the electoral college vote on January 6. He was among the rioters who forced the Senate to evacuate its chamber and suspend its Constitutional duty to certify the results of the 2020 presidential election. Montgomery contributed to the mob violence by assaulting a police officer, Officer D.H., because the officer was doing his job. Montgomery confronted police officers numerous times during his illegal journey through the Capitol, making it more difficult for police to clear and secure the Capitol.

Montgomery's conduct on that day was aggressive and highly confrontational. The Court must consider that the Montgomery's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the government recommends that the Court sentence Montgomery to 41 months of incarceration, a sentence which reflects the gravity of his conduct, which includes both assaulting a police officer and disrupting the certification with corrupt intent.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

The government refers the court to the Statement of Facts for Stipulated Trial filed in this case, ECF No. 233 at Section II, ¶¶ 1-7, for a short summary of the January 6, 2021, attack on the

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

**B.    Montgomery's Role in the January 6, 2021, Attack on the Capitol**

On the morning of January 6, 2021, Montgomery, Knowlton, and Wilson met at the Yours Truly hotel in Washington, D.C. When they left the hotel, Montgomery and Wilson saw that Knowlton was wearing a flak jacket. The three agreed that, if there was violence against the Trump supporters in the afternoon, they would stick together when they returned to their hotel.

After leaving the hotel, they walked to an area near the Washington Monument and the Ellipse to hear the speakers at the "Stop the Steal" rally. Montgomery, Knowlton, and Wilson were present for some of President Trump's rally at the Ellipse. By 2:01 p.m., they had crossed into the restricted area on Capitol grounds, near the scaffolding that had been erected on the west front of the U.S. Capitol.

At approximately 2:02 p.m., Montgomery approached Officer D.H. from the side, grabbed the officer's baton, and tried to wrestle it away from him. Officer D.H. held onto the baton, and he and Montgomery fell to the ground. While on the ground, Officer D.H. and Montgomery attempted to wrestle control of the baton from each other, as shown in Image 1.



*Image 1: (Stipulated Trial Exhibit 1): Screenshot from Officer D.H.'s body-worn camera footage showing MONTGOMERY (green jacket) and Officer D.H. (black gloves) attempting to gain control of Officer D.H.'s baton.*

To gain leverage over the officer in their fight over the baton, Montgomery kicked Officer D.H. directly and forcefully in the chest, as depicted in Image 1, which is a screenshot from Officer D.H.'s body-worn camera footage. Knowlton and Wilson observed some of Montgomery's conduct with respect to Officer D.H.

As the Court noted during the bench trial, just before Montgomery's violent clash with Officer D.H., Knowlton launched "an aggressive and angry exchange with police officers, challenging them about their oaths … in an aggressive and highly confrontational way... [that] could only be perceived by the officers at that time as confrontational and aggressive." Trial Tr. 3/20/24 at 6:21-24.



*Image 2: Screenshot from Officer D.H.'s body-worn camera footage (Stipulated Trial Exhibit 1) showing MONTGOMERY kicking Officer D.H.*

At approximately 2:28 p.m., Montgomery, Knowlton, and Wilson ascended the Upper

West Terrace Stairs with a mass of rioters who were "jeering loudly" (Trial Tr. 3/20/24 at 7:4).



*Image 3: MONTGOMERY (green), KNOWLTON (red), and WILSON (yellow), ascending the Upper West Terrace Stairs.*

At approximately 2:35 p.m., Montgomery, Knowlton, and Wilson entered the United States

Capitol Building through the Upper West Terrace Door.

5



*Image 4: MONTGOMERY (green), KNOWLTON (red), and WILSON (yellow), entering the Capitol Building through the Upper West Terrace Door.*

As the three approached the building, other rioters had propped open the exterior double doors, rioters were screaming loudly, and a loud alarm was sounding as rioters streamed into the Capitol. Signs on the inside of the doors stated, "EMERGENCY EXIT ONLY." Montgomery knew he was not allowed to enter the building at that time. *See* Stipulated Trial Exhibit 16, 8:40 to 9:41.

At approximately 2:35 p.m., USCP Lt. D.M. was standing in the interior of the Upper West Terrace Door, near the stairs leading up to the Rotunda. Stipulated Trial Exhibit 16, 9:00. Lt. D.M. and his fellow officers were severely outnumbered by the rioters entering through the Upper West Terrace Door. Lt. D.M. decided to not escalate the situation, and instead to take a defensive position for the safety of his fellow officers and the rioters.

After entering the Capitol building, Montgomery, Knowlton, and Wilson climbed the stairs to the second floor and entered the Rotunda at approximately 2:36 p.m. They left the Rotunda two minutes later and climbed the stairs to the third floor.

As the Court determined, the three passed through a "riotous situation where it was clear that the police officers were outnumbered, situation was out of control, individuals were acting in aggressive and violent manners." Trial Tr. 3/20/24 at 8:7-9. At approximately 2:40 p.m., Montgomery, Knowlton, and Wilson were walking in the hallway on the third floor towards the Senate Gallery when Knowlton stated in substance, and within earshot of Montgomery and Wilson, "We have a right to choose our electors. We're not going to have communist China choose them for us. We're not going to have the Democratic Party choose them for us."

At approximately 2:43 p.m., Montgomery, Knowlton, and Wilson were present outside the Senate Gallery where several USCP officers wearing dark-colored blazers were present. One of the officers was trying to lock the doors to the Senate Gallery. Some rioters yelled, "Don't you lock another door!" and "Grab the door!" as others assaulted two of the USCP officers. At this Court determined, "these officers were in danger. They were violently assaulted. There were a number of individuals with their fists raised and Messrs. Montgomery, Knowlton, and Wilson were standing right there as these officers were violently assaulted in order to keep the doors to the senate gallery open, so that individuals could enter the gallery … they are taking advantage of the fact that these police officers … have just been assaulted in order to gain entry to the Senate gallery." Trial Tr. 3/20/24 at 8:25-9:1-5, 9-12.

Immediately after those assaults, Montgomery, Knowlton, and Wilson were among the first rioters to enter the Senate Gallery. By then, the Senate Floor and Gallery had been evacuated, and Montgomery, Knowlton, and Wilson could see that the Senate Floor was empty.

While inside the Senate Gallery, Wilson and other rioters, within earshot of Montgomery, chanted, "Treason! Treason! Treason!" After witnessing another individual jump down from the Senate Gallery to the Senate Floor, Montgomery, Knowlton, and Wilson exited the Senate Gallery.

The three walked downstairs to the second floor of the Capitol and through the Ohio Clock Corridor to an area near Senate Minority Leader Charles Schumer's office. There, they confronted USCP Officer B.M.



*Image 5: KNOWLTON (red), MONTGOMERY (green), and WILSON (yellow) confronting USCP Officer B.M. (blue) outside of Senator Schumer's office.*

Officer B.M. was assigned as a Senate Chamber Officer on January 6, 2021. At approximately 2:49 p.m., he was standing in front of Senator Schumer's office, near an

entrance to the Senate Floor. In that area, there were clear indications that the Senate Floor was close-by, such as signs and pamphlets that said "Senate" and police presence. Officer B.M.'s assignment was to prevent anyone from entering the Senate from that area. Because USCP radio communication was down, Officer B.M. believed that the Senators were inside the Senate Chamber. Because the rioters had entered the building without authorization and without submitting to screening, Officer B.M. did not know whether they were armed. Officer B.M. recalled that Montgomery, Knowlton, and Wilson were more aggressive than the other rioters he had encountered on that day.

Knowlton said to Officer B.M., "We're with you guys," and "This is a moment in history. Right now is a moment in history. We don't want to push through there." Montgomery told Officer B.M., "All you gotta do is step out of the way." Officer B.M. did not interpret these statements as expressing sympathy for or solidarity with police. Rather, Officer B.M. reasonably understood Knowlton's and Montgomery's words and conduct as threatening, and aimed at getting him to leave his post so that Knowlton and Montgomery could confront Senators inside the Senate Chamber.

Officer B.M. believed that Montgomery, Knowlton, and Wilson eventually left the area once there was increased police presence and because it was clear that he was not going to let them through into the Senate Chamber.

Montgomery, Knowlton, and Wilson exited the Capitol building at approximately 2:53 p.m. After exiting the Capitol, they did not leave the Capitol grounds. Instead, they went to the East Plaza, where a large mass of rioters had gathered. Knowlton climbed atop of a police SUV and yelled toward the crowd.

### III.    THE CHARGES AND BENCH TRIAL

On August 19, 2022, a federal grand jury returned a Third Superseding Indictment charging Montgomery, Knowlton, and Wilson with obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. § 1512(c)(2); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G); and entering and remaining in the Gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B). ECF No. 115. Montgomery was also charged with assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1); civil disorder in violation of 18 U.S.C. § 231(a)(3); engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4); and act of physical violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). *Id.*

On March 18, 2024, the Court conducted a bench trial based on a set of stipulated facts. ECF No. 233. At trial, the government proceeded against all three defendants on Count Ten of the Third Superseding Indictment, which charged a violation of 18 U.S.C.§§ 1512(c)(2) and 2. ECF No. 115. In addition, the government proceeded against Patrick Montgomery on Count One, against Brady Knowlton on Count Five, and against Gary Wilson on Count Eleven. *Id.*

While the parties agreed to a set of facts, they did *not* agree that the defendants' conduct met the elements of Count Ten. *See* ECF No. 233 at ¶52. The parties *did* agree, however, that if the Court found the existence of the stipulated facts beyond a reasonable doubt, this evidence would establish each and every element of Counts One, Five, and Eleven. *See id.* at ¶53.

On March 20, 2024, the Court convicted Montgomery of Count One, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1), and Count Ten, Obstruction of an Official Proceeding and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2) and 2.

On June 28, 2024, the United States Supreme Court decided *Fischer v. United States*, 144 S. Ct. 2176 (2024), holding that § 1512(c)(2) requires proof that the defendant impaired or attempted to impair "the availability or integrity for use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding," and remanded the case to this Court for further proceedings. *Id*. at 2190.

After careful consideration of *Fischer*, the government moved to vacate Montgomery's § 1512(c)(2) conviction, ECF No. 262, which the Court granted, Minute Order 10/9/24.

Montgomery now faces sentencing on Count One, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1).

## IV.   STATUTORY PENALTIES

As noted by the Presentence Reports issued by the U.S. Probation Office, Montgomery faces the following exposure on 18 U.S.C. § 111(a)(1): 8 years of imprisonment, a term of supervised release of not more than 3 years, a term of probation of not more than 5 years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The Government calculates the Guidelines for Montgomery as follows.

11

## A.  Analysis for Count of Conviction

**Count One: Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) (Montgomery's assault on Officer D.H.)**

The Statutory Index references two Guidelines for 18 U.S.C. §111, U.S.S.G. §§ 2A2.2

(Aggravated Assault) and 2A2.4 (Obstructing or Impeding Officers).

| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic: Physical Contact | +3 | Pursuant to U.S.S.G. §2A2.4(b)(1), "If (A) the offense involved physical contact … increase by 3 levels."<br><br>Montgomery tried to grab Officer D.H.'s baton from him. As Officer D.H. and Montgomery wrestled for control of the baton, Montgomery fell to the ground, and Officer D.H. was brought to his knees. They both still had hands on the baton. While on the ground, Montgomery kicked the officer in the chest, causing the officer to fall backward. |
| Cross Reference | | Pursuant to U.S.S.G. § 2A2.4(c)(1), "[i]f the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." The Application Notes to Section 2A2.2, in turn, define "aggravated assault" as a "felonious assault that involved . . . (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.<br><br>Montgomery's conduct was aggravated assault because his assault was committed with the intent to commit another felony, specifically, Obstructing and Impeding Officers during a Civil Disorder, charged in Count Two, which is supported by a preponderance of the evidence. |
| Base Offense Level (adjusted) | 14 | Pursuant to U.S.S.G. § 2A2.2(a), the base offense level is 14. |

| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." |
|---|---|---|
| | | The evidence reflects that Montgomery's assault was motivated by Officer D.H.'s status as an MPD officer. Officer D.H. was clearly identifiable as a police officer. He was wearing a full MPD uniform, and he was with a group of officers who were also in full uniform. The officers were attempting to reach the Capitol building in order to prevent rioters from entering the building. Montgomery's assault was motivated by his desire to get past Officer D.H. and his fellow officers and get into the Capitol. |
| Total | 20 | |

### B. Acceptance of Responsibility

To determine whether a defendant clearly demonstrates acceptance of responsibility for his offense and therefore is eligible for a two-level decrease pursuant to U.S.S.G. § 3E1.1, it is appropriate for the Court to consider whether the defendant has truthfully admitted the conduct comprising the offense of conviction, and whether he has truthfully admitted or not falsely denied any additional relevant conduct for which the defendant is accountable under the Relevant Conduct guideline. U.S.S.G. § 3E1.1 cmt. n. 1(A). Based on those considerations, Montgomery has not accepted responsibility for his conduct and is not entitled to the downward adjustment.

Despite agreeing in a stipulation that his conduct met the elements of assault as charged in Count One, at the bench trial, Montgomery breached this agreement and disputed that his conduct met those elements. Specifically, during closing argument at trial, that Montgomery assisted his attorney in presenting,[3] Montgomery's attorney blamed Officer D.H. for Montgomery's own

---

[3] Immediately before his closing argument, Montgomery's attorney stated: "I want to have Mr. Montgomery sit right here so he can help me point out some little things in these videos," Trial Tr.

assault on the officer, arguing that the officer was "behaving differently" than the other officers, Trial Tr. 3/18/24 at 102:21, and that "Cops entered [these individuals'] space," *id.* at 104:17. That argument, at the very least, speciously implied that Montgomery and his fellow rioters had a right to be on the West Lawn of the Capitol, and the police were the intruders, "barging through," *id.* at 104:20. Montgomery's attorney also attempted to minimize his culpability by asserting that he was not the first person to attempt to grab Officer D.H.'s baton from him, an argument that was irrelevant to his guilt.

These claims are belied by Montgomery's words and actions, as captured in the stipulated facts and exhibits, and are irreconcilable with acceptance of responsibility. In one glaring example, Montgomery's attorney argued: "These defendants, Mr. Montgomery, were not invading the space of the officers . . . This was not an example of the crowd going up to the officers." *Id.* at 103. In fact, Stipulated Trial Exhibit 1, Officer D.H.'s body-worn camera, shows exactly the opposite – Montgomery approaching Officer D.H. and placing his hands on the officer's baton. Stipulated Trial Exhibit 1 at 14:02:13-17.

As a result of Montgomery's breach of the stipulation, the Government was required to respond to Montgomery's legal and factual arguments, and the Court was required to decide whether Montgomery's conduct met the elements of the charged offense. Furthermore, Montgomery's arguments make clear that he does not accept responsibility for any of his actual conduct on January 6. Montgomery's attorney's only concessions during the argument, despite the stipulations and the overwhelming video evidence to the contrary, were that Montgomery "made contact" and he "had some contact with a baton of an officer . . ." Trial Tr. 3/18/24 at 102:16-17,

---

3/18/24 at 95:3-5, and Montgomery did so.

and he "does grab onto that baton," *id.* at 107:16. The evidence proved that Montgomery did far more than that. This argument is a factual contestation of the conduct underlying his conviction, the antithesis of acceptance of responsibility, thus disqualifying Montgomery from the benefit of this two-level reduction.

### C.  Criminal History

The U.S. Probation Office calculated that Montgomery has 1 criminal history point for a conviction for possessing a dangerous or illegal weapon in Douglas County, Colorado, in 2021; therefore, his Criminal History Category is I. ECF No. 249 ¶ 86. The Government does not dispute this calculation, but as explained below in Section VI(B), Montgomery has a concerning, decades-long history of criminal conduct.

Because Montgomery has 1 criminal history point, he is not eligible for a zero-point offender adjustment pursuant to U.S.S.G. § 4C1.1(a)(1). Montgomery is also disqualified from the benefit of U.S.S.G. § 4C1.1 because he assaulted Officer D.H. U.S.S.G. § 4C1.1(a)(3)

### D.  Guidelines Range

At offense level 20 and Criminal History Category I, Montgomery's Guidelines range is 33 to 41 months of incarceration.

### E.  Other Guidelines Considerations

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because the defendant's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government must contextualize the crime. Moreover, the following information and argument make it clear that – while the government is not advocating

for such variance or departure – the high end of the Guidelines is not only reasonable, but fully balances the defendant's conduct and the circumstances in which he committed said conduct. One cannot divorce the gravity of the overall threat to democracy from the defendant's assaultive behavior.

Indeed, as it stands now, nothing in this defendant's Guidelines calculation reflects the fact that the defendant was responsible for substantial interference with Congress's work to peacefully transfer power from one administration to the next.[4] There are no specific offense characteristics here for attacking democracy or abandoning the rule of law. Thus, a sentence at the high end of the defendant's range properly "reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75 (RDM), Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell

---

[4] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, -- S.Ct. -- (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

Even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37 (TNM), 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157 (TNM), 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287 (TNM), 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513 (RBW), 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618 (ABJ), 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244 (TNM), 5/8/23 Sent. Tr.

Since *Fischer*, judges have similarly sentenced defendants to account for the disparity between the Guidelines and the actual context. For example, in *United States v. Sparks*, 21-CR-87 (TJK), Judge Kelly sentenced a defendant with an advisory Guidelines range of 15-21 months to 53 months' imprisonment. In doing so, the Court applied U.S.S.G. §§ 5K2.7 and 5K2.21, and noted that the jury had found that the defendant had the corrupt intent to interfere with Congress. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. Sent. Tr., at 94-95. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral

college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94.

Other judges have recognized this disparity too. *See United States v. Robertson*, 21-CR-34 (CRC) (imposing an upward departure because the conduct resulted in a significant disruption of government); *United States v. Dunfee*, 23-CR-36 (RBW) (imposing an upward departure because the Guidelines no longer adequately captured the defendant's intent to stop the peaceful transfer of power). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392 (RCL), ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sent. Tr. at 95. *See also United States v. Kelly*, 21-CR-708 (RCL), ECF No. 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6 (TJK), Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

18

To be clear, the fact that the government is not seeking a variance or departure does not diminish the gravity of our request and the need to appropriately account for the conduct and the crime.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Montgomery's conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

Montgomery intentionally contributed to the disruption of the certification of the electoral college vote on January 6. He was among the rioters who forced the Senate to evacuate its chamber and suspend its Constitutional duty to certify the results of the 2020 presidential election. Montgomery contributed to the mob violence by assaulting Officer D.H. because he was doing his job. Montgomery confronted police officers numerous times during their illegal journey through the Capitol, making it more difficult for police to clear and secure the Capitol.

Although any assault on police officers, particularly one that is unprovoked, is a highly serious offense, Montgomery's crime as far worse than most other assaults on an officer. Even though Montgomery's obstruction conviction cannot stand, his assault on Officer D.H. was particularly aggravated because it was motivated by Montgomery's intent to prevent the constitutionally-mandated Electoral College certification.

The nature and circumstances of Montgomery's offense were of the utmost seriousness, and fully support the Government's recommended sentence. If Montgomery were being sentenced on both counts of conviction – § 111(a)(1) and § 1512(c)(2) – his total offense level would have been 21, based on the grouping analysis. At total offense level 21 and Criminal History Category I, his Guidelines range would have been 37 to 46 months of incarceration. The government's recommendation of 41 months is the midpoint of that range. A sentence of 41 months is appropriate, because even though Montgomery's counts of conviction have changed, his criminal conduct has not.

**B. Montgomery's History and Characteristics**

Although Montgomery is currently unemployed, he was previously a long-time hunting guide and raft guide. Until January 2024, he worked at a carpet cleaning company. ECF No. 249 at ¶¶ 135-140.

Montgomery has an extensive criminal history, even though it results in only one criminal history point. ECF No. 249 at ¶¶ 75-85.

- On April 6, 1995, in New Mexico, Montgomery was charged with three counts of Robbery for stealing money from three different victims by using force or threatening the use of force. He pled guilty to all three counts on June 27, 1995, was sentenced on January 9, 1996, to 6 years of imprisonment and 2 years of parole.
- On March 23, 2002, in Oregon, Montgomery was charged with Driving Under the Influence of Intoxicants. On October 3, 2008,[5] he pled guilty and was sentenced to 10 days in jail and 36 months of probation.
- On March 11, 2004, in Colorado, Montgomery was charged with Driving Without a License. He pled guilty on March 10, 2005, and was sentenced to a fine.
- On December 9, 2004, in Colorado, Montgomery was charged with Driving While Ability Impaired. He pled guilty on April 27, 2005, and was sentenced to a fine.

---

[5] The information available to the U.S. Attorney's Office does not indicate why there was such a delay between charging in 2002 and conviction and sentencing in 2008.

- On October 28, 2006, in Colorado, Montgomery was charged with Hunting/Trapping/Fishing Without Permission. He pled guilty on September 25, 2007, and was sentenced to a fine.
- On August 8, 2007, in Colorado, Montgomery was charged with Driving Under the Influence. He pled guilty on July 16, 2008, and was sentenced to 90 days in jail, 2 years of probation, and community service. His probation was revoked on November 18, 2009, and he was sentenced to 30 days in jail.
- August 29, 2007, in Colorado, Montgomery was charged with Driving Under the Influence, just three weeks after he had been arrested for DUI. He pled guilty on April 4, 2008, and was sentenced to 45 days in jail, 2 years of probation, and community service. His probation was revoked on November 25, 2009, and he was sentenced to 75 days in jail.
- On May 31, 2009, in Colorado, Montgomery was charged with Driving Under Restraint[6] and Criminal Mischief. He pled guilty on November 18, 2009, and was sentenced to 45 days in jail and community service.
- On August 30, 2011, in Colorado, Montgomery was charged with Permitting Unauthorized Minor to Drive. He pled guilty on February 28, 2021, and was sentenced to a fine.
- On June 8, 2021, in Colorado, several months after his criminal conduct on January 6, Montgomery was charged with Possessing a Dangerous or Illegal Weapon, in connection with an incident that occurred on March 31, 2021, where Montgomery killed a mountain lion by shooting it with a .357 magnum handgun. He pled guilty on December 8, 2021, and was sentenced to 2 years of probation and community service.

Montgomery's most serious convictions are his 1995 robbery convictions and his 2021 weapons possession conviction. His robbery convictions, although remote, were serious crimes where he pled guilty to forcibly stealing cash from three different women on three different dates. The judge sentenced him to three years on each count, with two counts running consecutively. The six-year prison sentence clearly did not deter him from subsequent criminal conduct. The weapons possession conduct is most significant for its timing. It not only occurred during the pendency of this case, but it occurred a mere six weeks after this Court had set a condition of release that prohibited him from possessing firearms. *See* ECF No. 8. This conduct demonstrated the utmost

---

[6] "Driving Under Restraint" in Colorado means driving while a license is denied, revoked, or suspended.

disrespect for this Court's orders.

Montgomery's criminal activity demonstrates his persistent willingness to place his interests over those of the community. His multiple convictions for DUI particularly speak to this, as this is a crime that is inherently dangerous to innocent bystanders. The fact that he was arrested for DUI twice in three weeks in August 2007, resulting in his probation being revoked, shows again that his prior involvement with the criminal justice system did nothing to deter further criminal conduct.

His convictions for Hunting/Trapping/Fishing Without Permission, Driving Under Restraint, and Permitting Unauthorized Minor to Drive, although seemingly minor, show that Montgomery sees himself as exempt from legal rules that aim to keep communities safe.

Montgomery stands in stark contrast with the majority of January 6 defendants who have appeared before the Court with little to no criminal history – a testament to their otherwise law-abiding lives, and a consideration for the Court when imposing sentence. Here, Montgomery's criminal conduct is not limited to January 6, and appears to have enhanced over time, particularly in its brazenness. As such, Montgomery's history and characteristics weigh heavily in favor of a lengthy term of incarceration.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. As discussed above, the crime was of an unprecedented nature. Thus, the need to promote respect and deter future crime is equally important. The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[8]

And the risk of another attack on the Capitol remains. "The heated and inflammatory rhetoric that brought the defendant to the District has not subsided. The lie that the election was stolen and illegitimate is still being perpetrated." *United States v. Meredith*, 21-CR-159 (ABJ), Sent. Tr. at 94-95. If we are to prevent another January 6 and restore respect for the rule of law, sentences in these cases must send a message, and that message will not be conveyed by treating the January 6 riot as a run-of-the-mill offense.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Montgomery did not accept the results of the 2020 presidential election, so on January 6, he and his co-defendants trespassed into the Capitol and almost reached the Senate Floor, all the while excusing blatant violence against the police by fellow rioters, and in the case of Montgomery, actually perpetuating that violence. With the 2024 presidential election approaching, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence the defendants in a manner sufficient to deter each of them specifically

---

[8] Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

from going down that road again.

Montgomery's criminal history, which spans decades, demonstrates his unwillingness to comply with the law.

Montgomery provided a statement regarding the offense to Probation, where he expressed remorse for the first time since the inception of the case. ECF No. 249 at ¶ 49. Notably, he stated that he "would have to agree as to the finding of guilt as to my charges," and he apologized to Officer D.H.

While the Government concedes that his apology to Officer D.H. is sincere, Montgomery's statement is nevertheless peppered with the deflections of full responsibility that the Court heard at trial. Montgomery stated that his "reaction to that scenario was only a reflexive one and not meant to cause anyone any harm." Montgomery's conduct on the West Plaza, as clearly documented in Officer D.H.'s body worn camera footage, was deliberate and willful, and cannot be described as "reflexive." *See* Stipulated Trial Exhibit 1 at 14:02:13-17.

Additionally, Montgomery stated that there was "some misunderstanding and misappropriation of implied knowledge and intent on my behalf by the court," and lamented that he had not been "allowed" to provide testimony as to the events of January 6. ECF No. 249 at ¶ 49. In reality, Montgomery waived his right to testify at trial after a colloquy with this Court and consulting with his attorney. *See* Trial Tr. 3/18/24 at 35:2-12. This effort to deny his intent also appears to be inconsistent with the statement that he "would have to agree as to the finding of guilt as to my charges."

In short, Montgomery's expression of remorse is too little, too late.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. We do that here, despite the fact that there may be cases where an upward variance or departure are not only warranted, but entirely just. The government's recommendation underscores the reasonableness of the approach in this case.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[10]

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-CR-31 (FYP), Aug. 26, 2022, Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This Court has sentenced the defendants in *United States v. Bruno Cua*, 21-CR-107 (RDM), and *United States v. Matthew Miller*, 21-CR-75 (RDM), on 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1), the offenses which reflect Montgomery's conduct. The Court sentenced Cua to 12 months and 1 day of incarceration and 36 months of supervised release, and Miller to 33 months of incarceration and 24 months of supervised release.

Cua was convicted following a stipulated bench trial. His Criminal History Category was I, and his Guidelines range was 27 to 33 months of imprisonment. Cua's conduct was similar to Montgomery's – in fact, they were in many places at the same time throughout the day. They both entered via the Upper West Terrace Door around the same time, and it was Cua's assault of a USCP officer by shoving him repeatedly (along with Ronald Sandlin's assault of another USCP officer[11]), that allowed rioters, including Montgomery, to enter the Senate Gallery.

Despite these similarities, the Court should sentence Montgomery to a substantially higher sentence than it sentenced Cua for multiple reasons. First, Montgomery's assaultive conduct was more egregious than Cua's. Montgomery affirmatively approached Officer D.H., placed his hands on his baton, and fought the officer down to the ground to gain control of it. Montgomery then kicked Officer D.H. in the chest. Second, Montgomery has a substantial criminal record, whereas

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[11] *United States v. Ronald Sandlin*, 21-CR-88 (DLF). Judge Friedrich sentenced Sandlin to 63 months of incarceration and 36 months of supervised release on a plea to 18 U.S.C. § 1512(k) and 18 U.S.C. § 111(a)(1).

Cua did not. Third, the Court varied downward in imposing Cua's sentence because of Cua's youthful age at the time of the offense; he was eighteen years old. Fourth, the Court credited Cua's expression of remorse. None of those mitigators exist here. In fact, the opposite is true: there exist multiple aggravators that warrant a more serious sentence.

Unlike Montgomery, Miller pled guilty to some of the charges against him. His Criminal History Category was I, and his Guidelines range was 41 to 51 months of imprisonment. Miller's assaultive conduct was more protracted than Montgomery's. While inside the Lower West Terrace Tunnel, Miller unleased the contents of a fire extinguisher onto officers, threw a can of beer and batteries at officers, and encouraged rioters to push against police. Whereas Miller admitted guilt and took responsibility for his conduct by pleading guilty, Montgomery did the opposite: blamed Officer D.H. for Montgomery's assault on him. *See* Trial Tr. 3/18/24 at 102:20-22.

There are other cases outside of this Court, but within the framework set forth by §3553(a)(6) that showcase the reasonableness of the government's recommendation.

For example, Judge Nichols sentenced the defendant in *United States v. Richard Harris*, 21-CR-189 (CJN), to 41 months of imprisonment and 36 months of supervised release after he was convicted at trial on 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1), among other offenses. Harris engaged in two different altercations with police officers. First, he threatened and pushed an officer, and second, he grabbed a different officer's riot baton in the Rotunda and forced the officer into the angry crowd of rioters. Like Harris, Montgomery had multiple confrontations with police on Capitol grounds: first, he assaulted Officer D.H. on the West Lawn, second, he took advantage of another rioter's assault of an officer to gain entrance to the Senate Gallery, and third, he yelled at and berated Officer B.M. steps away from the Senate Floor. Harris, like Montgomery,

also had a Criminal History Category of I that understated his prior contacts with law enforcement. Harris' Guidelines range was 57 to 71 months of imprisonment. Judge Nichols varied downward to impose a sentence consistent with his prior sentences in *United States v. Garret Miller*, 21-CR-119 (CJN), and *United States v. Matthew Beddingfield*, 22-CR-66 (CJN), defendants who were convicted of 18 U.S.C. § 111(a)(1), but not 18 § 1512(c)(2), and both of whom Judge Nichols sentenced to 38 months of incarceration. Judge Nichols sentenced Harris to 41 months of incarceration, stating: "Mr. Harris' actions were above average in severity and culpability as compared to others who have been sentenced to the same charges that we have here, but not nearly as severe or culpable as people I've sentenced for similar crimes." *United States v. Harris*, 21-CR-189 (CJN), Sent. Tr., at 87. A downward variance is not appropriate in Montgomery's case, however, given that, unlike Harris, his Guidelines range does not fully capture his conduct.

Judge Lamberth sentenced the defendant in *United States v. Scott Fairlamb*, 21-CR-120 (RCL) to 41 months of imprisonment and 36 months of supervised release on a plea to 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1). Fairlamb yelled at officers on Capitol grounds: "Are you an American? Act like a fucking one! . . . You guys have no idea what the fuck you're doing!", using language similar to that Montgomery used while berating Officer B.M. Fairlamb then shoved an officer, stuck his finger in his face, and punched the officer's face shield. Both Montgomery and Fairlamb used a combination of aggressive language and physical assault in their confrontations with police. Fairlamb's Criminal History Category was I, and 41 months was the low end of his Guidelines range of 41 to 51 months of imprisonment. Given that Montgomery's Criminal History Category of I does not adequately capture his criminal history, and that Montgomery's Guidelines range does not fully capture his conduct, a sentence at the high end of

Montgomery's Guidelines range is warranted here.

Judge Kelly sentenced the defendant in *United States v. Dale Shalvey*, 21-CR-334 (TJK), to 41 months of imprisonment and 24 months of supervised release on a plea to 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1). Shalvey assaulted a police officer on the West Front during the initial breach of the Capitol by hitting him with an object at close range. He then entered the building and proceeded to the Senate Chamber where he rifled through Senators' desks, took pictures of their documents, and stole and destroyed a letter written by Senator Mitt Romney. Shalvey had no criminal history, and his Guidelines range was 41 to 51 months of imprisonment. Given that Montgomery's conduct is analogous to Shalvey's, Montgomery has an extensive criminal history, and that Montgomery's Guidelines range does not fully capture his conduct, a sentence at the high end of Montgomery's Guidelines range is warranted here.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases

involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). As Montgomery was convicted of a violation of an offense under Title 18, the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full

restitution without respect to a defendant's ability to pay.[12]

Because Montgomery, in this case, engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold each defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

Specifically, the Court should require Montgomery to pay $2,000 in restitution for his conviction on Count One. This amount fairly reflects Montgomery's role in the offense and damages resulting from his conduct. Moreover, in cases where the parties have entered into a plea

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

agreement, $2,000 in restitution for felony pleas has consistently been the agreed-upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing Guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Montgomery's conviction for 18 U.S.C. § 111(a)(1) is subject to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). Montgomery's financial assets and liabilities set forth in the PSR indicate, on their face, that Montgomery is unable to pay a fine. ECF No. 249 at ¶ 141. However, Montgomery is represented by retained counsel and did not return the release form authorizing the U.S. Probation Office to conduct a credit inquiry. *Id.* at ¶ 142. Additionally, Montgomery created an account on GiveSendGo, a fundraising website, which had a balance of $400 as of May 25, 2024. *Id.* at ¶ 148.

Montgomery has not shown an inability to pay; thus, pursuant to the considerations

outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The Guidelines fine range here is $15,000 to $150,000. U.S.S.G. § 5E1.2(c). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994). The Court should impose a fine in the amount of $400.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court sentence Patrick Montgomery to 41 months of incarceration, 36 months of supervised release, $2000 in restitution, a $400 fine, and a mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    */s/ Carolina Nevin*
CAROLINA NEVIN
Assistant United States Attorney
NY Bar No. 5226121
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
202-803-1612
carolina.nevin@usdoj.gov